## Case No. 6,645.

HOLMES et al. v. TROUT et al.

[1 McLean, 1.] [1]

Circuit Court, D. Kentucky. May Term, 1829. [2]

SURVEY—ENTRY—DEED—DELIVERY.

1. An entry that calls to begin at a tree marked J. P. about two miles up the first branch above Eighteen Mile creek. is sufficient. though the marked tree on the bank of the creek. is forty poles less than two miles from the mouth of the creek. A distance of forty poles. on a straight line. more or less, is not an unreasonable range within which a subsequent locator should search for the object called for.

[See note at end of case.]

.2. The words used in an entry should be construed in reference to their popular signification. rather than to their grammatical arrangement.

[See note at end of case.]

3. A deed to Holmes, though absolute upon its face, is considered as intended to be made in trust: and under the circumstances, it is not considered as having been delivered.

4. An amendment of the original bill, as it asserts a new title. is considered. as it regards the statute of limitations. the filing of a new bill. Effect is given to the statute of limitations. there having been an adverse possession of twenty years. against the right asserted in the amended bill.

[Cited in Williams v. Carpenter. 42 Mo. 332; Illinois Cent. R. Co. v. Cobb, 64 Ill. 141.]

[This was a bill in equity by James Holmes and others against the heirs of Daniel Trout and William Moreland, to settle the title of certain lands.]

Mr. Todd. for complainants.
Mr. Wickliffe, for defendants.

OPINION OF THE COURT. The complainants state in their bill that "Edward

---

[1] [Reported by Hon. John McLean. Circuit Justice.]

[2] [Affirmed in 7 Pet. (32 U. S.) 171.]

Voss, on the 11th October, 1783, made with the surveyor of the proper county, the following entry:—Edward Voss enters 10,000 acres by virtue of two treasury warrants, No. 8991 and 8990, beginning at the northwest corner of Patton's 8,400 acres survey, thence with Allen's line westwardly to the river, and along Roberts' line on the east for quantity." "Also 5,000 acres by virtue of treasury warrant No. 8,989, beginning at the south-west corner of Patton's 8,400 acres survey, then westwardly with Patton's, Pope, and Thomas' survey, thence up the river and on Patton's line on the east for quantity." That surveys having been duly executed on said entries the same were assigned to a certain Peyton Short, to whom patents were issued, dated the 12th and 14th March, 1790. That on the 10th December, 1796, Short conveyed to John Holmes, by deed, his whole claim to the land; but that by contract it is now jointly held by Holmes and the other complainants, and that the land is held by Holmes for their joint benefit. The complainants further state that conflicting entries have been subsequently made, by different persons, on the same land, and elder patents obtained, and they pray that a conveyance may be decreed to them on the ground of their prior equity.

In their answers, the respondents deny the equity set forth in the complainants' bill, and having the elder legal title founded upon valid entries and surveys, they pray the bill may be dismissed. Since the commencement of the present term the complainants have filed an amended bill, stating that the whole of the land in contest, was purchased for the use and benefit of Holmes, Slater, Caton, and Omealy; and that subsequently, by the consent of Slater and Caton, Omealy became their trustee. That an agreement was entered into between the complainants and a certain John Breckenridge, deceased, by which he undertook to render certain services as an attorney, for which he was to have one moiety of the land. That the original deed to Holmes never having been recorded, was handed to Breckenridge, with other papers relating to the business, and with directions to Short to make a deed to complainants and Breckenridge. That the said Breckenridge being in possession of the deed to Holmes, and authorized to receive a conveyance from Short to himself and the complainants, agreed to cancel the deed to Holmes, which was done by delivering it to Short, who cancelled it by erasing his name; and a new deed was made by him to Breckenridge and to William Omealy, as trustee for John Holmes and William Slater; and to Hugh Thompson as trustee for Richard Caton, dated 21st September, 1804. The amended bill further states that Breckenridge departed this life in January, 1806, before his part of the contract was performed; and that a bill was filed against his heirs by the complainants, for a re-conveyance of the land. That on the final hearing of the case the court decreed, as Breckenridge had but in part performed his contract, the deed should be cancelled as to all the lands within two adverse claims, to wit: that of the defendant, Howard, and —— Williams and Brown, and the complainants were decreed to convey to Breckenridge's heirs, a moiety outside of these claims. In pursuance of this decree, deeds were executed.

The complainants state that the whole of the land in controversy, is included in John Howard's claim, under which the defendants claim, and is referred to in the deed from Breckenridge's heirs to them; and that since the date of such deed, the equitable title has been vested in them. To the amended bill, Jeremiah Trout, William Buchanan, Jacob Overpeck, John Moreland, Walter A. Moreland, and William Moreland, defendants, answer, that they, with those under whom they claim, have been in the actual occupancy and peaceable possession of all the land claimed by them in their former answers, for more than twenty years before the filing of the amended bill, and they deny the statements made in it. On filing the amended bill, the parties agreed that the suit should progress in the names of the parties on the record, and that no advantage should be taken on account of the death of either of the parties, since the pendency of the suit; and that the decree shall be as valid as if the heirs of any such party were before the court.

It was also agreed that John Howard entered on the land in controversy, by virtue of his claim of 7,945½ acres by his tenants, and within the claim of C. Clark, that the entry was within the boundary of said Clark, and that Howard's claim wholly covered the claim of Clark. That this entry was made in the year 1804, and continued without interruption, adverse to the claim of Voss and Short, set up by the complainants, until the year 1813, when Howard, in an action of ejectment, by virtue of Clark's claim, was evicted and possession taken by William Moreland, a purchaser from Clark; and that such possession was continued by said Moreland until his death, and that his devisees have remained in the possession adverse to the complainants ever since. It was admitted that Daniel Trout, in the year 1808, purchased the claim of Daniel and Hite's 600 acres, within the tract claimed by the claimants, and at that time by his two sons, Daniel and Jeremiah, entered into the possession, which is still continued. That the defendants, Overpeck and Buchanan, in the year 1818, entered into the possession of the above tract under the said Daniel and Jeremiah, and have resided on it until the present time, all of whose possessions are adverse to the complainants. The grant of Daniel and Hite is admitted to be elder in date than Howard's or any other interfering claim. Clark's grant is older than Howard's, and Short's

is junior to it. As the defendants possess the elder grant, the complainants must rely on their prior equity; and to show this they endeavor to sustain the entry of Voss, under which they claim. This entry calls to begin on the north-west corner of Patton's 8,400 acres survey, and for Allen's and Roberts' line. Patton's entry was made the 26th December, 1782, for 8,400 upon a treasury warrant, No. 12,311, about two miles up the first branch above the Eighteen Mile creek, beginning at a tree marked "J. P." to run north, five miles, then to extend off at right angles for quantity. This entry was surveyed on the 20th September, 1783, and calls to begin at a mulberry, elm, and sugar tree, marked "J. P.," standing on the bank of the first large creek running into the Ohio, above the Eighteen Mile creek, two miles up the said creek. On the 11th October, 1783, John Allen entered 1,000 acres, part of a treasury warrant, No. 14,198, beginning at the north-west corner of Patton's 8,400 acres survey, and running with his line S. 250 poles, thence down the creek on both sides westwardly for quantity, to be laid off in one or more surveys. Roberts' entry was made the 26th December, 1782, the same day Patton's entry was made.

It is argued by the counsel for the defendants, that Patton's entry, on which Voss' entry was made, is void for want of certainty and notoriety in its calls. The depositions of several witnesses have been read to sustain this entry. William Merriweather swears that Eighteen Mile creek was known previous to the year 1782, and that Patton's creek is the first one running into the Ohio above Eighteen Mile creek, except Bell's spring branch, which is not much more than a mile in length. That Patton's creek was so called from the time the above entry was made, and was generally known by that name as early as October, 1783. He does not recollect the year he became acquainted with the tree marked "J. P.," but he thinks within a year or two after the entry was made he was at the tree, about two miles up Patton's creek lacking forty poles, in company with persons who were about purchasing Patton's entry. The letters "J. P." were very large, and marked on a mulberry tree standing near the creek. That Patton informed him of the entry shortly after it was made, and that he had marked the tree and run one of the lines, before he made the entry. He states from the appearance of the tree, he has no doubt of its having been marked at the time as represented by Patton. He further states, he thinks it would be almost impossible for any one to have searched for the tree without finding it. And after finding the beginning corner of Patton's entry and survey, it would not be difficult for a subsequent locator to find by tracing the line, the north-west corner. Other witnesses prove the same facts. No doubt can

exist that the Eighteen Mile creek was generally known at the time the entry was made, and that the branch called for is the one known by the name of Patton's creek. Between this creek and the Eighteen Mile creek, there is one or two small branches, neither of which could be taken for the call in the entry. But it is objected to the entry, that the call about two miles up the first branch, is not sufficiently definite to direct a subsequent locator to the marked tree. That the side of the creek on which the tree stands, is not designated, nor its distance from the creek; and that by actual measurement on a straight line from the mouth of the creek, the distance to the tree falls forty poles short of two miles. It is also contended that by the calls of the entry, it would seem to have been the intention of the locator that the body of the land should lie about two miles up the creek, rather than that point should constitute his beginning corner. This objection seems not to be well taken. The words of the entry are, "James Patton enters 8,400 acres," &c. "about two miles up the first branch above the Eighteen Mile creek, beginning at a tree marked 'J. P.'" &c. No one it is believed, could mistake these calls, or hesitate to conclude that the tree marked was the beginning corner. From this corner the entry calls to run five miles north, &c.

The rule which governs in the construction of entries has been long fixed, and if this were not the case, it would obviously result from circumstances. Entries were made at an early day by individuals who were better acquainted with the stratagems of savage warfare, than the precision of language. They were better hunters than critics. Entries must be construed by the popular signification of the terms used, rather than by the grammatical arrangement of sentences. If the intention of the locator can be satisfactorily ascertained from the calls of his entry, it must be sustained. The call to run up the creek in popular signification, directs the enquirer to follow the stream. As the Eighteen Mile creek is below Patton's creek, any person beginning his search at that point for the marked tree would trace the Ohio to Patton's creek, and would naturally seek for the marked tree on the lower side about two miles from its mouth. But it would not be unreasonable to require a search on both sides of the creek. This search would somewhat increase the labor of a subsequent locator, but it would scarcely lessen the probability and indeed certainty of finding the object. No witness saw the tree marked, but Merriweather saw it one or two years afterwards, and from the appearance of the letters "J. P.," he seems to have no doubt that they were made at the time Patton represented them to have been made. Saunders saw these letters in May, 1783, and the tree was pointed out to him by Patton, as his beginning corner. This was within five

months after the entry was made, and several months before the entry of Voss. Several witnesses state that the beginning of Patton's entry could be found by observing its descriptive calls.

Under the facts established, the court are of the opinion that the entry of Patton is shown to possess all the requisites of a valid entry. The variation of forty poles on a straight line from the distance called for in the entry, is not considered material. The circumstances under which this entry was made, would authorize no one to expect greater accuracy. Forty poles more or less than the exact distance of two miles, is a sufficiently limited range, within which for a subsequent locator to search for the object called for. This entry was surveyed on the 20th September, 1783, twenty days before the entry of Voss. Voss's entry calls for the survey of Patton, though it does not appear at that time to have been recorded. The north-west corner of this survey, which is the beginning called for in Voss's entry, could easily be found by tracing the line from Patton's beginning corner. Any variation in the length of this line, from the calls of the entry, cannot be material as to the dependent entry; as the distance is controlled by the marked corner, proved to have been made. The other calls in the entry of Voss are believed to be sufficiently certain, to enable the holder of a warrant to locate the adjacent lands, and this is a substantial compliance with the requisitions of the land law. The other entry of Voss for 5,000 acres, which calls to begin at the south-west corner of Patton's survey, seems to have been made conformably to law. To show a title from the patentee, a deed dated the 10th December, 1796, from him to John Holmes for 13,500 acres, is given in evidence. The signature of the grantor in this deed has been erased, apparently with the view of cancelling it. But, it is contended if such an inference can arise from the erazure, that the cancellation of the deed does not re-invest the fee in the grantor. That this can only be done by the solemnities of a deed duly executed. One of the subscribing witnesses to this deed, whose deposition is used to prove its execution, states that he was written to by Short to endeavor to make sale of the land for him; that on being told by Holmes what was the best he could do with it, witness advised him to sell, and told him he thought Short would be satisfied; and the witness understood the land was sold. He also states from his letter book, the deed appears to have been forwarded by him to Holmes, on the 3d January, 1797. A letter from Short to Holmes the 29th September, 1794, proposes to sell the lands at a certain price. This letter, however, treats Holmes as an agent to sell the land, and not in the light of a purchaser. An obligation, signed by Short 10th December, 1796, is also in evidence. In this obligation Short states, that he has executed a deed to

Holmes of that date for two certain tracts of land containing 13,500 acres; which said deed is deposited in the hands of W. Morton, of Lexington; and, that should Holmes be dissatisfied with the warranty given in said deed, and it is not in pursuance of the meaning and intention of the above letter, he agrees to enter into such an instrument of writing.

From the whole of this evidence, it would seem to authorize the conclusion that the deed executed to Holmes was only designed to enable him to sell and make titles to the lands, for the benefit of Short. But, if any doubt remained on this subject, it is removed by a subsequent deed executed by Short, for the same lands, to Holmes and others, without any reference to the former deed; and by the amended bill of the complainants, who state that the first deed was cancelled by agreement between Breckenridge and Short, and that they claim title under the one subsequently executed. The first deed, though absolute upon its face, was intended to make Holmes a trustee for the use of Short, and the court have no difficulty under the circumstances, in considering it a nullity, so far as it respects the present controversy. This deed has never been recorded nor does it seem to have been treated by the parties as a valid instrument. There is no satisfactory proof of its delivery. From all the facts it appears most probable that it was forwarded to Breckenridge by Caton or some other person, and that it was never in the possession of Holmes, or intended to be. The complainants must rely upon their conveyance from Hart, dated 21st September, 1804. This deed conveys to John Omealy, trustee for John Holmes and William Slater, and to H. Thompson, trustee of Richard Caton; and to John Breckenridge the tracts of land set forth in the bill. From the amended bill it appears that Breckenridge was entitled to a moiety of the entire claim as a compensation for certain services to be rendered by him. That he died before these services were completed, and that the complainants filed their bill against his heirs and obtained a decree to certain parts of the land, which were afterwards conveyed to them by the heirs of Breckenridge.

A question is here made by the defendants' counsel, whether the title set up by the complainants in their amended bill is not in fact the commencement of a new suit; and, consequently, gives the defendants a right to insist on the statute of limitations, in bar of the complainants' right of recovery. If this shall be the effect of asserting the title in the amended bill, it is agreed between the parties that advantage may be taken of it. In the original bill, the title is stated to have been derived from Short, the patentee to Holmes, with whom contracts were made by the other complainants, for certain interests in the land. The amended bill sets up a title by deed from Short to John Omealy, trustee for John Holmes and William Slater, and

to H. Thompson, as trustee for Richard Caton, and to John Breckenridge. At law there is a material distinction between these titles, but not in equity. Under both deeds the equitable interest of the parties may be the same. In the original bill it is stated, that Holmes acquired the title and held it for the use of the complainants. Such an alteration, therefore, in the bill, as states the deed was made to them by Short instead of its having been made to Holmes for their use, cannot be considered as the assertion of a new title, or the commencement of a new suit. The case, however, is different so far as it respects the interests of the complainants, under the decree against the heirs of Breckenridge. A conveyance from them to the complainants was decreed on the ground that the consideration had, in part, failed. In the deed to Breckenridge there was no reservation or condition, no agreement to reconvey on any contingency. It was only by the aid of a court of chancery, that the right of the complainants could be established and enforced against a part of the land. Until the decree which cancelled the deed was pronounced, the complainants possessed no claim in law or equity to the land in question which could be rendered effective against the claim of the defendants. To the decree, therefore, must the complainants look for the origin of their title. This decree was obtained in November, 1822, and for the first time a claim is set up under it in the amended bill. This must be considered as the assertion of a title distinct from that which is set out in the original bill; and, as regards the statute of limitations, must be considered as the commencement of a suit. It follows, therefore, that the title to the land conveyed to the complainants, under the decree against the heirs of Breckenridge, in so far as it covers the land which has been occupied by the defendants, and those under whom they claim, adversely to the complainants for twenty years before the filing of the amended bill, in law and equity is vested in the defendants. The residue of the tract claimed by the defendants within the entry of Voss, must be relinquished to the complainants, as they hold the prior equity.

At a subsequent term surveys having been executed in accordance with this opinion, a final decree was entered.

[NOTE. From this decree the complainants appealed to the supreme court, where the decision was affirmed in an opinion by Mr. Justice McLean. 7 Pet. (32 U. S.) 171. It was held that the variation of 40 poles from the distance called for in Patton's entry was as little as could be expected under the circumstances. All the law requires is that the beginning corner could be found without difficulty. The evidence established prima facie that the tree called for was marked when the entry was made. In Kentucky, surplus land in a survey does not vitiate it. "The right asserted under the survey of Voss must be limited by the valid entries under which a part of the defendants claim to the calls of the entry which shall cover the quantity of acres that the surveyor purported to convey." Where there is no object called for to control a rectangular figure, that form shall be given to the survey.]

HOLMES (UNITED STATES v.). See Cases Nos. 15,382 and 15,383.

HOLMES (WALLACE v.). See Case No. 17,-100.

HOLMES (WAYNE v.). See Case No. 17,303.

HOLMES, The LUCY C. See Case No. 8,-597.

## Case No. 6,646.

In re HOLT.

[3 N. B. R. 241 (Quarto, 58).] [1]

District Court, S. D. New York. Sept. 20, 1869.

BANKRUPTCY—EXAMINATION OF BANKRUPT.

Where bankrupt is upon his examination and fails to answer proper questions propounded, he will be compelled to answer by the court.